IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

BP AMERICA PRODUCTION COMPANY,

    Petitioner,

vs.

DEBRA ANNE HAALAND, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR, and KIMBRA DAVIS, DIRECTOR, OFFICE OF NATURAL RESOURCES REVENUE, UNITED STATES DEPARTMENT OF THE INTERIOR,

    Respondents.

Case No. 21-CV-0105-F

---

### ORDER AFFIRMING AGENCY ACTION

---

Defendant Kimbra Davis (Director) issued a decision ordering BP America Production Company (BP) to pay $905,348.24 in underpaid royalties attributable to production from federal leases in the Jonah Field for April 2012 through October 2012. BP filed an administrative appeal, and argued it sold the properties to Linn Energy Holdings, LLC (Linn) effective April 1, 2012. Because the royalty dispute was not timely resolved by the Department of the Interior (Interior), BP exercised its right to immediate judicial review. 30 U.S.C. § 1724(h)(1). For the reasons that follow, the Court affirms the Director's decision requiring BP to pay the royalty obligation of $905,348.24.

## BACKGROUND

Relevant to the dispute before the Court, the State of Wyoming conducted a federal royalty audit for production in the Jonah Field for January to October 2012 and, on April 21, 2016, provided BP an audit issue letter finding underpaid royalties. AR-17 – 25. From May until September, BP and the State discussed the findings. AR-26 – 40. On September 27, 2016, BP changed positions[1] and advised the State that it was only responsible for January through March of the 2012 audit, as it sold the properties to Linn effective April 1, 2012. AR-41[2] & 435.

The transfer or assignment agreements between BP and Linn note the various dates executed, along with "EFFECTIVE as of the 1st of April, 2012" typed underneath the date executed. AR-49 – 87; 104 – 185; 203 – 225. However, BP did not file these agreements with the Bureau of Land Management until September and October 2012. *Id.* BLM approved the agreements, stamping the date approved and the approval effective date as "the first day of the lease month following the date of filing." *Id.*; 30 U.S.C. § 187a. Consequently, the effective date stamped by BLM was either October 1, 2012 or November 1, 2012. AR-49 – 87; 104 – 185; 203 – 225.

The State disagreed with BP as to its responsibility to pay, contending BP was the payor of record or operating rights owner through October 2012, and issued an Order to

---

[1] The Director explains this reversal of position based on BP having learned that Linn sought bankruptcy protection. Doc. 1-1, p. 7. It is correct that, by September, Linn had filed for bankruptcy. *In re Linn Energy*, LLC, No. 1660040 (Bankr. S.D. Tex., filed May 11, 2016).

[2] "[Department of Audit] asked why the change and why now instead of back in April when the Issue Letter was sent? BP responded that they sold the properties to Linn. DOA responded that this is a total shocker and what is the basis of BP's position? [BP] then stated it is in their sales agreement with Linn and he would have his lawyer respond as to this basis." AR-41.

2

Report and Pay $1,031,377.23 in unpaid royalties for these seven months. AR-6 & 9. BP appealed that Order to Defendant Kimbra Davis, Director of the Office of Natural Resources Revenue. AR-467. On September 30, 2020, the Director affirmed the State's Order to Report and Pay as amended, reducing BP's payment obligation to $905,348.24. CM/ECF Document (Doc.) 1-1. BP appealed the Director's decision to the Interior Board of Land Appeals (IBLA). AR-1. The IBLA did not issue a final decision within the statutory 33-month time period, as extended by the parties to December 2, 2020. 30 U.S.C. § 1724(h)(1). BP filed a timely Petition for Review on May 26, 2021 (Doc. 1), and the Court has jurisdiction to hear this matter.

## STANDARD OF REVIEW

This case is brought seeking judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). Under the APA's deferential standard of judicial review, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The scope of review under the APA is "narrow[,] and [the] court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The court's role is to ensure the agency's decision is based on relevant factors and is not a "clear error of judgment." *Id.* Stated otherwise, in exercising its narrow role of review authority under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors.

3

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989); *Citizens to Preserve Overton Park*, 401 U.S. 402, 416 (1971) (abrogated in part on other grounds).

"Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Under this standard, *Chevron* analysis may apply. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020). If *Chevron* deference applies, the Court engages in a two-step review process. *Chevron*, 467 U.S. at 842–43.

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* (footnotes omitted).

## DISCUSSION

**1. Is the Court's jurisdiction restricted to reviewing only 11 of the 443 specific underpaid royalties, and does the Court review the Director's decision or a "silent" Secretary's decision which articulates no basis?**

BP argues because Interior failed to timely resolve the royalty dispute, this triggered two consequences – (i) Interior was "deemed" to have issued a final decision in BP's favor for all but 11 of the individual "monetary obligations" captured by the Director's decision;

4

and (ii) Interior was "deemed" to have partially *silently* affirmed the Director's decision as to the remaining 11 "monetary obligations." According to BP, the scope of the dispute over which the Court has jurisdiction is limited to the 11 royalty underpayment findings – identified by lease, product and production month – which total $10,000 or more. This would leave 432 royalty underpayment findings effectively vacated by operation of law (i.e., a "deemed decision" in BP's favor).[3]

Interior points out that BP's argument directly conflicts with the regulatory definition of "monetary obligation" found at 43 C.F.R. § 4.903:

> Monetary obligation means a lessee's, designee's or payor's duty to pay, or to compute and pay, any obligation in any order . . . . To determine the amount of any monetary obligation, for purposes of the default rule of decision in § 4.906 and 30 U.S.C. 1724(h):
>
>  (1) If an order asserts a monetary obligation arising from one issue or type of underpayment that covers multiple leases or production months, the total obligation for all leases or production months involved constitutes a single monetary obligation;
>  (2) If an order asserts monetary obligations arising from different issues or types of underpayments for one or more leases, the obligations arising from each separate issue, subject to paragraph (1) of this definition, constitute separate monetary obligations[.]

In considering this issue, the Court begins with the statutory language from the Federal Oil and Gas Royalty Simplification and Fairness Act (simplified as "RSFA"):

> (h)(1) ... The Secretary shall issue a final decision in any administrative proceeding ... within 33 months from the date such proceeding was commenced [which may be extended by the parties] ....
>  ...
> (2)  If no such decision has been issued by the Secretary within the 33-month period referred to in paragraph (1) –

---

[3] By this argument, the scope of the royalty dispute would automatically reduce from $905,348.24 to $218,576.49.

> (A) the Secretary shall be deemed to have issued and granted a decision in favor of the appellant as to any nonmonetary obligation and any monetary obligation the principal amount of which is less than $10,000; and
>
> (B) the Secretary shall be deemed to have issued a final decision in favor of the Secretary, which decision shall be deemed to affirm those issues for which the agency rendered a decision prior to the end of such period, as to any monetary obligation the principal amount of which is $10,000 or more, and the appellant shall have a right to judicial review of such deemed final decision in accordance with Title 5 [of the United States Code].

30 U.S.C. § 1724(h)(1)-(2).

The Court must construe this statute in order to ascertain the intent of Congress in conferring jurisdiction on the federal courts to consider matters in administrative proceedings that are not timely determined. *See Murphy Expl. & Prod. Co. v. U.S. Dept. of the Interior*, 252 F.3d 473, 480 (D.C. Cir. 2001). While the focus of the parties is on the phrase "monetary obligation," this focus is misplaced. Based on the clear language of Section 1724(h)(2)(B), the appellant (BP) has the right to judicial review of the Secretary's deemed decision which ***affirms those issues*** determined in the Director's decision as to any monetary obligation of $10,000 or more. In this case, the issue decided by the Director was the effective date of BP's assignment of record title or transfer of operating rights for the leases. See, Doc. 1-1, p. 9. As to that issue, the Director's decision resulted in a monetary obligation of $905,348.24. Consequently, that issue was deemed affirmed by the clear and unambiguous language of Section 1724(h)(2)(B), and the scope of the Court's jurisdiction is not limited to 11 royalty underpayments as argued by BP.

Finally, BP argues that the Court can only review the Secretary's deemed (silent) final decision, which must be rejected as the Secretary provides no articulated basis. This

argument is unpersuasive as it would effectively nullify all deemed affirmed final decisions under the RFSA. BP provides no legal support for this outcome, and such an outcome would be contrary to the statutory language. Given that BP exercised its right to seek judicial review before the IBLA issued its final decision, the Court will look to the Director's decision for the articulated basis.

**2. Is BP liable for royalties attributable to production after March 2012?**

BP argues that it filed the transfer forms with the BLM in September and October 2012, and those forms specifically stated the transfer was effective as of April 1, 2012. BLM's subsequent approval was "solely for administrative purposes,"[4] and cannot change the effective date of the transfer. Therefore, when the State issued its audit findings (2017) and the Director issued her decision (2020), BP was neither a record title owner nor an operating rights owner of the leases at issue for any periods after March 2012. Under RSFA, only record title owners and operating rights owners are liable for royalty payments. 30 U.S.C. § 1712(a). Thus, BP argues that the decision requiring it to remit additional royalties attributable to production after March 2012 exceeds the scope of Interior's authority under RSFA.

Interior argues the Director correctly found the effective date of BP's transfers to Linn were determined based on 30 U.S.C. § 187a and 43 C.F.R. § 3106.7-4. Doc. 1-1, p. 3.

---

[4] This language is noted on each form.

7

Relevant to this case, the Mineral Leasing Act (MLA) provides that "[n]o lease issued under the authority of this chapter shall be assigned or sublet, except with the consent of the Secretary of the Interior." 30 U.S.C. § 187. In addition, "any assignment or sublease shall take effect as of the first day of the lease month following the date of filing in the proper land office of three original executed counterparts thereof . . . ." *Id.* § 187a. And unless and until the Secretary approves the assignment or sublease, "the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed." *Id.* Finally, pursuant to 30 U.S.C. § 189, Congress authorized the Secretary to "prescribe necessary and proper rules and regulations" to give effect to the MLA. *Id.* § 189.

The relevant implementing regulations state:

> (a) You are responsible for performing all obligations under the lease until the date BLM approves an assignment of your record title interest or transfer of your operating rights.
>
> (b) After BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer. ….

43 C.F.R. § 3106.7-2.

> The signature of the authorized officer on the official form shall constitute approval of the transfer of record title or of operating rights (sublease) which shall take effect as of the first day of the lease month following the date of filing in the proper BLM office of all documents and statements required by this subpart and an appropriate bond, if one is required.

43 C.F.R. § 3106.7-4.

The Director's decision includes the following key findings and conclusions:

8

> Neither Form 3000.3 nor Form 3000.3a provides a place for the assignor or the transferor to choose an effective date other than that provided by federal law. And the only place on either form to set the effective date is expressly reserved "FOR BLM USE ONLY."
>
> ...
>
> BP may not bind the government by typing a date – April 1, 2012 – out of place, contrary to the lawful instructions accompanying each Request Form, and the clear requirements of governing law, including 30 U.S.C. § 187a and 43 C.F.R. § 3706.7-4.
>
> ...
>
> The only relevant contracts here are the Leases, between BP and the United States, each requiring BP to follow federal law in transferring its rights under the leases to a third party. BP may not ignore the Leases or federal law because of problems that BP experienced in its commercial relations with Linn. Those problems are neither a burden that can be transferred to the United States, nor are they grounds for disregarding the law or the terms of the Leases.

Doc. 1-1, pp. 10 – 12.

BP's arguments are unpersuasive. The Director's decision is not only consistent with the MLA, but is required by law. By the clear and unambiguous language of the MLA, BP's assignment of record title or transfer of operating rights for the leases took effect as of the first day of the lease month following the date of filing, which was either October 1, 2012 or November 1, 2012. For federal leases, BP cannot change its statutory or regulatory obligations by any negotiations with a third party, or by altering the transfer forms to type in a different effective date for the transfer.

3. **Can Interior require BP to remit underpaid royalties as a secondarily liable record title owner, without seeking performance or recovery first from Linn as a primarily liable party?**

The last issue raised by BP relates to four leases where BP assigned its record title to Linn effective November 1, 2012. Doc. 26, p. 41. Because Linn, the primarily liable

9

party, filed for bankruptcy protection, Interior ordered BP, the secondarily liable party, to pay the additional royalties due under the State audit.

BP argues that Interior cannot require it to pay as a secondarily liable party because Interior failed to demand payment from Linn.

The RSFA states:

> The person owning operating rights in a lease shall be primarily liable for its pro rata share of payment obligations under the lease. If the person owning the legal record title in a lease is other than the operating rights owner, the person owning the legal record title shall be secondarily liable for its pro rata share of such payment obligations.

30 U.S.C. § 1712(a).

BP provides no legal support for its argument that conditions (or restricts) Interior's right to seek payment from BP only after seeking it from Linn. Further, as pointed out by Interior, BP did not notify either the State or Interior that it would not pay its audit obligations until September 27, 2016, months after Linn filed for bankruptcy protection and was shielded from collection by the automatic stay. Once Linn became unavailable to satisfy its primary liability for whatever reason, Interior had authority to demand payment from BP as the legal record title owner in the four leases.

## CONCLUSION

The Director's September 30, 2020 decision was not arbitrary, capricious an abuse of discretion, or otherwise not in accordance with the law, nor did it exceed statutory or regulatory authority. Consequently, it is **AFFIRMED**.

Dated this 14th day of March, 2022.

_____
NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE